## THISTLEWOOD, ET AL., ETC. v. TRIAL MAGISTRATE FOR OCEAN CITY, WORCESTER COUNTY

[No. 45, September Term, 1964.]

*Decided November 17, 1964.*

The cause was argued before HENDERSON, C. J., and HAM-
MOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Henry F. Lankford* for appellants.

*Marcus J. Williams, City Solicitor* for Mayor and City
Council of Ocean City, Maryland, with whom were *Thomas B.
Finan, Attorney General,* and *Robert F. Sweeney, Assistant
Attorney General,* and *W. Ross Hockersmith, State's Attorney
for Worcester County,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellants, who are brothers, both under twenty-one at
the time here pertinent, were convicted by a trial magistrate
of violating an ordinance of Ocean City, Maryland, which pro-
hibited persons under twenty-one from remaining on the streets
of the town between the hours of 12:01 a.m. and 6:00 a.m. on
each of the days from Saturday, August 31, to Tuesday, Sep-
tember 3, of 1963 (the Labor Day weekend). They were ar-
rested at 4:55 a.m. on Saturday the 31st and tried later in the
day, being convicted and fined $10.00 and costs. They appealed
to the Circuit Court for Worcester County, but the appeals were
not perfected and not pressed. Instead, on September 13, 1963,
a petition for a writ of certiorari was filed in the circuit court
seeking a review of the proceedings before the magistrate and
the annulment of the convictions on the ground that the curfew

ordinance was illegal, unconstitutional and void because it unduly restricted the personal liberties of the petitioners. At least for the purposes of the case, the appellants admitted that if the ordinance was valid they had violated it.

The writ issued and after a hearing before the four judges of the First Judicial Circuit, sitting together, an opinion was filed upholding the constitutionality of the curfew ordinance. The brothers appealed to this Court.

It is established that the circuit court in the exercise of its common law jurisdiction may grant the writ of certiorari to review the decision of a magistrate upon the specified ground that the unconstitutionality of the statute involved left the magistrate without jurisdiction and that an appeal will lie to this Court from the judgment of the circuit court. *Rayner v. State,* 52 Md. 368; *State v. Jacob,* 234 Md. 452. In *State v. Stafford,* 160 Md. 385, Stafford, who had been convicted by the magistrate on June 4, noted an appeal to the circuit court on June 12, but did not press the appeal; rather, as did the appellants here, he sought certiorari on July 14 to test the jurisdiction of the magistrate. After he lost in the circuit court, he filed an appeal which this Court entertained and decided.

Code of Public Local Laws of Worcester County (Everstine, 1961), Sec. 185, enumerates the powers the Legislature has given the Mayor and City Council of Ocean City:

> "to pass all such ordinances not contrary to the Constitution of this State as it may deem necessary:
> * * *
> "For the preservation of peace and good order and securing persons and property from violence, danger or destruction.
> "For the protection of the health, comfort and convenience of the citizens of Ocean City and visitors thereto or sojourners therein.
> * * *
> "* * * and to prohibit the youth of said city from being on the streets, lanes or alleys at unreasonable hours of the night."

On August 13, 1963, Ocean City enacted Ordinance 120-A

"* * * to impose a curfew on the youth [those under twenty-one] within the corporate limits of the town * * *" from Saturday, August 31, to Tuesday, September 3, the Labor Day weekend, between the hours of 12:01 a.m. and 6:00 a.m. The ordinance recites that Sec. 185, quoted in part above, gives Ocean City the power to pass such a law and that during the Labor Day weekends of 1960, 1961 and 1962:

"* * * Ocean City suffered from the presence in the municipality of extremely disorderly groups of minors, said disorder amounting almost to riots, requiring many police officers, both local and state, and, on occasions, police dogs, to control the situation and maintain the peace of an otherwise normal and peaceful community, and to protect the property and personal safety of visitors to and residents of Ocean City * * *." [1]

The legislative body of Ocean City therefore, then, ordained:

1. "* * * that a state of curfew is hereby declared for persons under 21 years of age, on all public streets, ways, avenues, alleys or beaches * * *" during the proscribed hours.
2. "* * * that notice of the imposition of this curfew shall be given by sound-powered voice or other public announcement device between the hours of 11:30 o'clock p.m. of the previous day and 12:01 o'clock a.m. * * *" of the curfew days, instructing all persons under twenty-one years of age to remove themselves from the streets, ways and beaches of the town.

---

[1]. In 1962, before Labor Day, Ocean City passed an ordinance authorizing the imposition of a curfew when in the opinion of a commission consisting of the Chief of Police, the Mayor and the City Solicitor, a curfew was necessary. The ordinance was declared unconstitutional by the Circuit Court for Worcester County for the reason that it impermissibly delegated legislative power. See State of Maryland v. Thomas B. Hulcher, No. 1891 Cir. Ct. Worcester County.

3. That any person under twenty-one years of age "who shall be found on any public street, way, avenue, alley or beach" during the prohibited times "shall be in violation of the provisions of this ordinance and subject to immediate arrest."

Curfew regulations have been said to have been brought into England by William the Conqueror (although during the reign of Alfred there was an ordinance that Oxford inhabitants should retire at the tolling of a curfew bell) and the name is said to have come from the French words, *couvre feu,* for covering the fire. Originally the curfew was used to require, at a given signal or a given time, that the fires in homes be covered or protected for the night, but the Conqueror used it to require the English to be off the streets or away from a given area at a prescribed time in order to prevent their gathering together.

In this country, before the War between the States, there were curfew laws in southern towns to designate the times when slaves could be on the streets. Curfew legislation aimed at juveniles received its first substantial support in the latter part of the nineteenth century. By the turn of the century, approximately three thousand municipalities and villages had adopted juvenile curfew ordinances. Interest in such curfews then waned until the Second World War, when, with parents in the armed services or working in war plants, often at night, and with the influx of servicemen into urban areas, conditions again brought into vogue curfews aimed at preventing juveniles from roaming the streets or loitering in public places. Currently, some forty-eight cities with populations of over one hundred thousand have curfews aimed at minors, which are enforced (nine others have such laws but admit they do not enforce them). The National Institute of Municipal Law Officers has prepared a *Model Curfew Ordinance* (Rhyne Ed. 1952, National Institute of Municipal Law Officers, Model Curfew Ordinance Service, Secs. 7.401, 7.402). Oregon is the one State with an outright curfew law, although eleven others have laws against vagrancy or loitering which to a great extent have the effects of curfews. Generally, curfew laws are of one or the other of two

types—the "presence" type in which it is forbidden *to be* on the street after a certain time, and the "loitering" or "remaining" type in which the proscription is against loitering, congregating or remaining on the street. Zealous enforcement has often made one the equivalent in practice of the other. Both types often have exceptions excepting minors who are with a parent or on an emergency mission.

Much of this background and description of curfew laws was taken from a carefully prepared and thorough article entitled "Curfew Ordinances and the Control of Nocturnal Juvenile Crime" in 107 Pa. L. Rev. 66 (1958). For other interesting discussions of the curfew law see 1 Villanova L. Rev. 51; 55 Mich. L. Rev. 1026; and 32 Tulane L. Rev. 117.

Despite the widespread prevalence of curfew ordinances in the past and at the present time, the cases dealing with the constitutionality of such statutes are few, and, in all but one instance, not the decision of the highest court of the State.

In *Ex Parte McCarver* (Ct. Cr. App. of Tex. 1898), 46 S. W. 936, the Town of Graham, Texas, which had not been given the power by the legislature to control the presence of minors on the street, but which, nevertheless, had passed a curfew ordinance prohibiting persons under twenty-one from being "found" on the street after 9:00 p.m., unless with parent or guardian or in search of a doctor, found its ordinance challenged in the highest Texas Court empowered to deal with it. That Court said that if the town had been expressly empowered to pass the ordinance it would not have been inclined to pass on its reasonableness, but since it had not, the court would inquire into the reasonableness of the ordinance in relation to the preservation of the public peace and the protection of the good order and morals of the community. The ordinance was found unreasonable because it unduly restricted minors from having "* * * the same rights of ingress and egress that citizens of mature years enjoy," that is, it was construed as a "being" or "presence" type. There was no discussion or consideration of the paramount right of the State to control and regulate minors.

The Court in *Baker v. Borough of Steelton* (1910), 17 Dauphin County Pa. Reports 17, took a different view, upholding as constitutional an ordinance which made it unlawful for any

person under sixteen to remain on the streets after 9:00 p.m. unless accompanied by a parent, or on an emergency errand, evidenced by a writing signed by a parent. The opinion distinguished *McCarver* on the point that the town of Graham had neither inherent nor delegated power to pass such an ordinance. On the positive side, the Pennsylvania Court relied on the doctrine that children traditionally have been wards of the State and thus are more within its control than adults. The reasoning of the Court reflected both the history and the current theory of the State's right to regulate the behavior of minors. (In its inception the jurisdiction over minors belonged to the King as *parens patriae* to protect his young subjects. Because of the special powers of the State over minors, many laws pertaining only to them or restricting them only, which would not be effective as to adults, have been upheld on the ground that the classification was not unreasonable or illegally discriminatory. Thus, children may be compelled to go to school, to be vaccinated or otherwise medically treated and they can be deprived of the right to vote, to drive motor vehicles, to purchase or possess liquor, to marry, under specified ages, to engage in certain businesses or professions or to deal with property.)

The court in *People v. Walton* (App. Dep't, Super. Ct., Los Angeles Co., Calif., 1945), 161 P. 2d 498, had to determine whether the charge, that the defendant parent unlawfully permitted his child to remain on a public street at a proscribed time in violation of a curfew ordinance, could be sustained. The Court held that the word "remain" in the ordinance meant "to stay behind when others withdraw," "to tarry," and "to stay," and that the ordinance was aimed at preventing minors from "* * * tarrying and staying unnecessarily upon the streets and public places, and does not restrict those minors who are using or are on such streets or places while actually in the process of going to or from places of business * * *." The Court stated that the ultimate question to be decided was whether, in so restricting the movements and privileges of minors, the County of Los Angeles had exceeded its legislative powers for lack of reasonable relationship between the evil sought to be controlled and the regulatory measures enacted, and whether such measures were beyond the police power of the County, under the state or federal constitution.

In conclusion, the Court pointed out the many regulations and restrictions which legislatures validly have imposed on children as opposed to adults, distinguished the *McCarver* case as dealing with a "presence" type ordinance and said if it could be construed as meaning no juvenile curfew was permissible "* * * it is out of step with the great weight of authority dealing with the right of legislative bodies to pass laws properly necessary for the protection of minors," and then upheld the ordinance.

*Alves v. Justice Court of Chico Judicial District* (Dist. Ct. App., 3rd D., Calif., 1957), 306 P. 2d 601, dealt with an ordinance making it unlawful for a minor under seventeen "to be in or on" any street, park, square or other public place between 10:00 p.m. and 5:00 a.m. unless with a parent or guardian or unless the presence of the minor was connected with or required by some legitimate business or profession in which the minor was engaged. Only *McCarver* and *Walton* were cited to the Court, which found the ordinance like that in *McCarver* rather than like that in *Walton* which "had none of the broad restrictive provisions of either the *McCarver* or the present case" and held the ordinance invalid, essentially because it was a "presence" proscription rather than a "remaining" type.

Although not directly in point, the following cases lend support to the view that a "remaining" type curfew ordinance is constitutional even when the statute applies to adults. *People v. Zalon*, 145 N. Y. S. 2d 269 (prohibition against "loitering or remaining" in parks after midnight held constitutional) ; *City of Portland v. Goodwin* (Ore.), 210 P. 2d 577 ; and *Guidoni v. Wheeler* (9th Cir.), 230 Fed. 93. See also *Beail v. District of Columbia* (Mun. Ct. App.), 82 A. 2d 765 and cf. *Cox v. New Hampshire,* 312 U. S. 569, 85 L. Ed. 1049.

Reading the Ocean City ordinance so as to give significance to all its parts, we construe it to forbid the "remaining" on the streets and other public areas of the town rather than as merely being on or traversing them. This is the connotation of the reference to past troubles from "disorderly groups of minors" which suggests that the aim of the ordinance was against the congregating and subsequent presence and joint action of such groups. No particular leaning either way is revealed by the

phrase "a state of curfew" in Sec. 1, since this could mean either type. The loud publicly announced instruction to leave the streets provided in Sec. 2 of the ordinance, followed by the provision in Sec. 3 that those who thereafter are "found" on the street, supports the suggestion of the preamble that the aim of the ordinance is against those who remain on the public areas during the forbidden period, that is, those who then loiter or congregate.

A curfew law, like any other which restricts the activity or conduct of individuals, adult or minor, must not exceed the bounds of reasonableness. Three primary tests have often been invoked. (1) Is there an evil? (2) Do the means selected to curb the evil have a real and substantial relation to the result sought? (3) If the answer to the first two inquiries is yes, do the means availed of unduly infringe or oppress fundamental rights of those whose activities or conduct is curbed?

The recitals in the Ocean City ordinance almost demonstrate the evil to be dealt with; the means adopted, of forbidding the loitering on the street, so as to prevent the formation and resulting unlawful acts of disorderly groups, bears a real and substantial relation to the objects sought to be attained.

There remains only the ultimate and critical question of whether the means, in view of the evil, unduly affronted fundamental rights of the minors assembled over the Labor Day weekend at Ocean City.

That summer resort town, which over Labor Day weekends becomes swollen a hundred fold from its usual winter size and to several times its average summer day size, thought it necessary to enact the challenged ordinance as a short term emergency measure to protect both its citizens and visitors from groups of minors and the minors from themselves. Ocean City being a holiday resort and the time being the Labor Day weekend, almost all of the minors affected by the curfew would be visitors or pleasure bent, who would not be using the streets for the ordinary or serious purposes they most often would be if at home. The curfew was applicable only on the four crucial nights which the town legislature knew from experience were the dangerous nights of the year because marauding groups of minors, which formed because its members, not knowing what

to do for pleasure or "kicks," after midnight, remained and loitered on the streets or boardwalk, looking, in the vernacular, for trouble.

We think the fundamental rights of minors were not affronted or violated by the ordinance. Maryland has recognized, as have other States, that the activities and conduct of those under twenty-one may be regulated and restricted to a far greater extent than those of adults.

In *Ex Parte Cromwell*, 232 Md. 305, in partial answer to the claim that the infant petitioners had been found to be juvenile delinquents solely because they had been arrested on several occasions close in time for participating in peaceful protests against racial segregation in violation and deprivation of their constitutional rights to free speech, contrary to the Fourteenth Amendment, this Court said (p. 309) :

> "We think it is far from clear that the infant petitioners have the same Constitutional rights to participate in protests as are enjoyed by adults. Children are under recognized disabilities in many respects. They do not enjoy the right to vote, to enlist in the military forces, or to operate motor vehicles (under the age of sixteen). Because of their lack of mature judgment they are subject to the continuing control and supervision of parents or guardians until they become of age or are emancipated."

The all but demonstrated need for emergency use of the curfew in a resort town over Labor Day, the late and relatively short hours of the curfew and the fact that there were only four curfew days, the fact that its limited purpose was to prevent loitering or remaining in public areas, as opposed to merely using them for passage, and, finally, the fact that it was directed only to minors who are peculiarly subject to regulation and control by the State, lead us to the conclusion that the ordinance assailed was not unreasonable or oppressive and, therefore, was valid.

*Judgments affirmed, with costs.*