STATE OF CONNECTICUT *v.* ARNOLD BOLES

CIRCUIT COURT                    SIXTH CIRCUIT
                          FILE No. CR 6-50614

Memorandum filed December 13, 1967

*Paul M. Foti,* assistant prosecuting attorney, for the state.

*Arthur B. LaFrance,* of New Haven, for the defendant.

LEVISTER, J. The defendant is charged by information with breach of the peace in violation of General Statutes § 53-174; violation of an executive order under special law (New Haven Spec. Laws § 21; 13 Conn. Spec. Laws 395 § 13); and disorderly conduct in violation of General Statutes § 53-175. The defendant has moved to quash or dismiss the information filed against him.

In support of his motion, the defendant has presented four propositions, all of which, if sustained, would render the information against him null and void. These four propositions are as follows: (1) The mayor of New Haven did not have the power to impose a curfew, and his attempt to do so was a nullity. (2) The curfew was void because it failed to make exceptions for reasonable and necessary activity, thereby denying personal liberty without due process of law. (3) There was inadequate notice given of the imposition of a curfew, and a conviction, therefore, would deny due process of law. (4) The curfew and the provisions under which curfew violations are being prosecuted are unconstitutionally vague and, therefore, void.

These claims will be considered in the same order in which they were presented.

## I

There is no question that the power of the mayor to impose a curfew must be found either in a state statute or the charter of the city of New Haven. It is also clear that the New Haven charter does not explicitly empower the mayor to impose a curfew. Under the provisions of § 6 of the New Haven charter, the mayor is the chief executive and administrative officer of the city. He is empowered by § 7 to have and exercise certain powers of appointment and administration, including (§ 7 [h]) "all other executive and administrative powers conferred by the laws of the state upon any municipal chief executive, except as otherwise provided in this charter."

Special laws confer upon the mayor the power to assume control of the police and fire forces in a time of emergency and to exercise all of their powers in enforcing the law; New Haven Spec. Laws § 20 (1); 13 Conn. Spec. Laws 394 § 12 (1); to exercise all the powers conferred upon the sheriffs in suppressing riots; New Haven Spec. Laws § 20 (2); 13 Conn. Spec. Laws 394 § 12 (2); and to request the assistance of the national guard. New Haven Spec. Laws § 20 (3); 13 Conn. Spec. Laws 395 § 12 (3). Hindering, obstructing, resisting or abusing the mayor in the execution of his office is punishable by fine or imprisonment. New Haven Spec. Laws § 21; 13 Conn. Spec. Laws 395 § 13.

As stated above, under the provisions of § 20 (2) of the New Haven Special Laws (Conn. Spec. Laws 394 § 12 [2]), the mayor may exercise all the powers conferred upon sheriffs in suppressing riots. Thus, when the mayor does exercise authority pursuant to this special law, he obviously stands in the shoes of the sheriffs. We now must determine the source and extent of the sheriffs' powers. General Stat-

utes § 6-31 provides as follows: "Each sheriff may execute in his county all lawful process directed to him, shall be conservator of the peace and may, when necessary, with force and strong hand, suppress all tumults, riots, unlawful assemblies and breaches of the peace and may raise the power of the county and command any person to assist him in the execution of his office." It is common and public knowledge that on the days that the mayor imposed a curfew, the city of New Haven was rocked asunder by tumultuous and riotous conditions: looting and destruction of property were prevalent; and the general welfare of the entire city was seriously threatened. It was such circumstances that were envisioned by the General Assembly of the state of Connecticut when it enacted § 20 (2) of the New Haven Special Laws (13 Conn. Spec. Laws 394 § 12 [2]) and General Statutes § 6-31. It seems clear that under these two statutory provisions, and in view of the circumstances then prevailing, the mayor acted within his authority. Indeed, failure to have so acted might well have been considered a dereliction of duty.

It is to be noted that under § 20 (3) of the New Haven Special Laws (13 Conn. Spec. Laws 395 § 12 [3]) the mayor could have requested assistance from the national guard. But recent outbreaks of riots across the width and breadth of this land have taught us the sad and painful lesson that whenever such assistance has been sought and received, the bad situations inevitably became worse before they got better.

In Newark, in Detroit, in Birmingham, in Milwaukee, and in Watts, hundreds of lives were lost and millions of dollars in property destroyed, and in each case outside assistance was sought and received. In New Haven not one life was lost and

there were very few incidents of personal injury. Property damage was kept at a minimum.

It appears that the mayor did have the power to impose a curfew, and since he did it by so declaring on each day that a curfew was necessary, it likewise appears that he exercised his proper authority wisely.

## II

The gravamen of the defendant's second contention is that in order for the curfew to be valid it should have contained "built-in exceptions" for reasonable and necessary activity and, failing this, it constituted a denial of personal liberty without due process of law. Under usual and normal circumstances and as a general proposition, this may be true. But the circumstances existing at the time were not usual, nor were they normal.

The defendant cites in his brief *Aptheker* v. *Secretary of State,* 378 U.S. 500, 508, and quotes, in part, this passage: " 'The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.' " What the defendant overlooks is that how drastic the means can be and still remain within the bounds of what may be deemed permissible largely depends upon the nature of the circumstances provoking the abridgment. The *Aptheker* case involved the issuance or refusal of passports to Communists or Communist sympathizers or those suspected of being so. This is far different from a curfew designed to prevent or contain a riot. Our constitution is not a static document, "for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should

be otherwise." *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365, 387; *State* v. *Hillman,* 110 Conn. 92, 105.

Who can deny that our concept of social order and social structure is changing? In each of the summers since 1963, riots in all parts of this nation have become nothing less than the vogue. Too often, if a large city does not experience a riot or two, it occasions the inquiry, "Why not?" or the accusation that the community is apathetic. Certainly this is a new trend that must of necessity be met with new remedial and preferably preventive measures. Obviously, the most desirable and preventive measure is to labor hard to make each community an open community. But since this cannot be done in one day, there is no justification for permitting lawless disorder. The existence of injustice to our fellow human beings can never bring us to condone violence, lawlessness, hate, arson and destruction, for this would be the beginning of the end of our hoped-for free society.

While we must make every effort to protect our constitutional guarantees, and while the constitution protects against invasions of individual rights, it is not a suicide pact. In the 1965 riot in the Watts section of Los Angeles alone, 34 persons were killed, 1032 injured, and 3952 arrested. Some 600 buildings were damaged. Some $40 million in property was destroyed. In New Haven, the chief executive officer acted with dispatch to prevent comparable harm. Of course, it would have been preferable if he had been permitted time to provide exceptions. But people en masse, bent on disruption and destruction, are not guided or controlled by a clock. Of course, it would have been preferable if the mayor could have designated certain sections of the city in which the curfew was imposed. But fire and smoke are wide ranged, not localized.

If the argument is accepted that exceptions for necessary activity are the sine qua non for the validity of an order imposing a curfew, the question immediately arises as to who will determine the sincerity and genuineness of a claimed "necessary activity" under such circumstances as existed in New Haven at the time with which we are concerned. A riot if not immediately checked leaves little time for inquiry into a person's real goal for being abroad during the curfew hours. During such emergencies, the inconvenience of a few must give way to the protection of the many.

A riot, being susceptible to the wide-range involvement of so many people, is not to be compared with the issuance of passports. A riot or a threat of a riot presents a clear and present danger which may require an unusual exercise of police power. And a law or an executive order (such as here) which is uniform in its operation is not rendered invalid merely because of the limited number of persons who will be affected by it. *State* v. *Zazzaro,* 128 Conn. 160, 165; *Walp* v. *Mooar,* 76 Conn. 515.

No one can argue successfully that the temper of the times in New Haven was anything less than dangerous. And activities even more dangerous, if unchecked, could reasonably have been anticipated. Activities obviously dangerous or detrimental to the public welfare, safety, health and morals, or activities which may reasonably be expected to have that effect, may be prohibited. *Gionfriddo* v. *Windsor,* 137 Conn. 701, 704; *State* v. *Heller,* 123 Conn. 492, 495; see *Seaboard Air Line Ry.* v. *North Carolina,* 245 U.S. 298, 304. The court cannot close its eyes to what was a clear and present danger. In considering legislation (here an executive order during an emergency) involving police power, courts will make every presumption and intendment in favor of the validity of the legislation and sustain

it unless its invalidity is beyond reasonable doubt. *Murphy, Inc.* v. *Westport,* 131 Conn. 292, 302; *Gionfriddo* v. *Windsor,* supra; *Schwartz* v. *Kelly,* 140 Conn. 176.

It has been determined that the mayor did in fact have authority to impose the curfew under the special law and the general statute. Our Supreme Court has said: "The ordinance is an exercise of the police power of the city, and whether present conditions require the degree of regulation imposed by the ordinance [in the instant case an executive order under a special law] is a matter for the judgment of the legislative body of the city. Courts can interfere only in those extreme cases where the action is unreasonable, discriminatory or arbitrary." *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553; *Karen* v. *East Haddam,* 146 Conn. 720, 726; *Clark* v. *Town Council,* 145 Conn. 476, 482.

A report by the president's commission on law enforcement and administration of justice which is entitled, "The Challenge of Crime in a Free Society," released in February, 1967, points to the following revelation under the subheading "Riots," at page 37: "The principal objects of attack were most often just those people or institutions, insofar as they were within reach, that the rioters thought of as being their principal oppressors: Policemen and white passers-by, or white owned commercial establishments, especially those that charged high prices, dealt in inferior merchandise or employed harsh credit policies. Loan offices were a favorite target. Homes, schools, churches, and libraries were, by and large, left alone." Certainly, if a study and report of the commission, which covered the entire country, revealed this, who can say a city-wide curfew, excluding all persons from the public streets during a limited number of hours for four specified days,

was unreasonable? Who can say that no human life would have been lost had the mayor not invoked the curfew? We will never know. But we do know that no life was lost during the tumultuous circumstances when the curfews were invoked.

All of the cases cited by the defendants predate the period in our history when city after city across this land was experiencing devastating riots. Before this very court, a New Haven citizen was charged with inciting to riot. The evidence was clear and convincing that two men headed a group of 200 to 250 persons down the middle of a main thoroughfare, in the face of a cordon of police officers, shouting, "Don't let them scare you, let's go downtown and burn it down." Only the use of modern police weaponry broke up what was certainly a dangerous situation.

Finally, as to this contention, ideally exceptions should have been made. Likewise ideally, the clear and present danger should never have arisen. The court cannot say categorically that the curfew was too broad or that it denied personal liberty without due process of law. The court takes the position that the exigency of the time in question warranted the imposition of the curfew in the manner employed by the mayor.

## III

The defendants next raise the objection that there was inadequate notice given of the imposition of the curfew.

The term "adequate notice" can only mean "reasonable notice." The term "reasonable notice" is a relative term which varies with the circumstances under which it is called into use. *E. M. Loew's Enterprises, Inc.* v. *Surabian,* 146 Conn. 608; *Fairfield* v. *D'Addario,* 149 Conn. 358.

It seems established that the first known disturbances in New Haven occurred on Saturday night, August 19, 1967, at approximately 9 p.m. The disturbances continued until approximately 3 a.m. on Sunday, August 20, 1967. Thereafter, a calm seemed to settle over the city, only to disrupt again at approximately 4 p.m. on August 20, 1967.

On Sunday, August 20, 1967, between the hours of 4 and 5 in the afternoon, the mayor of New Haven notified radio stations WAZZ, WELI, WICC and WNHC and TV stations WNHC and WTIC that he was issuing an executive order imposing a curfew effective at 8 p.m. that evening. He further notified the Associated Press and the United Press International and received coverage through these two agencies. The aforementioned stations began broadcasting notice of the executive order immediately. Beginning Monday, August 21, 1967, both the New Haven Register, an evening paper, and the New Haven Journal Courier, a morning paper, published front page headline coverage of the disturbances in the papers, including the executive order of August 20, 1967. In addition, the Columbia Broadcasting System and the American Broadcasting System, both with national audiences, sent representatives from New York to conduct full coverage of the disturbances, and these too included the notice of the executive order. Such was the publication of the notice of the curfew for each of the days on which the curfew was imposed.

The defendant, in his brief, cites *Lambert* v. *California,* 355 U.S. 937. There a Los Angeles city ordinance required all felons to register with the chief of police within five days of entering the city. The defendant failed to do so and was convicted. The United States Supreme Court voided the conviction because of the lack of opportunity to be apprised of the law. That case is not analogous to the instant

case. Here, the mayor was faced with an emergency which required immediate action to prevent immediate harm to the life and property of an entire city. Time was of the essence, and had the mayor delayed taking action until he had met the requirement of "reasonable time" as urged by the defendant, it would have been too late. To paraphrase and copy from an old legal maxim, in this case, action delayed would have been action betrayed.

As to the mode of notice, suffice it to say that the nature of the circumstances dictated the method to be employed. In such cases, newspaper, radio and television notice not only is the best method under these circumstances, it is the only method.

## IV

The defendants finally argue that the provisions under which the curfew violations are being prosecuted are too vague and therefore void. They then argue that the police had to recognize exceptions such as hospital and fire department personnel.

First, as to § 21 of the New Haven Special Laws (13 Conn. Spec. Laws 395 § 13) : When the mayor assumed the authority of the sheriffs, as he had a right to do, disobedience to the curfew was clearly an interference with his duty to keep the peace, and the validity or the legality of the curfew at that point was not up to the determination of New Haven's 149,000 citizens. The jurisdiction to determine whether a statute or an ordinance is in conflict with the constitution is in the judiciary. *Siller* v. *Siller,* 112 Conn. 145, 151. After all, a statute or an ordinance is but an empty vessel into which the court pours the wine, and individual citizens may not decide if the mayor's authority is invalid. They must first comply, and if they feel aggrieved they have the right to seek legal redress.

As to the vagueness of General Statutes § 53-174 (breach of the peace), our Supreme Court has said: " 'The peace' has been defined by us to be 'that state and sense of safety which is necessary to the comfort and happiness of every citizen, and which government is instituted to secure.' " *State* v. *Van Allen,* 140 Conn. 586, 589; *Malley* v. *Lane,* 97 Conn. 133, 138. It is sufficient that the acts intentionally committed are of such a nature that they naturally cause serious disquietude on the part of those in the vicinity. 1 Bishop, Criminal Law (9th Ed.) § 539. A breach of the peace is a breach of the public quietude and tranquility. "Each individual is entitled to be secure in his person, to be free from unjustified molestation by others, and to be guarded by the law against any unwarranted intrusion upon his tranquility. Upon this foundation rests the existence of an orderly and civilized society." *State* v. *Boyer,* 2 Conn. Cir. Ct. 288, 294.

When riotous conditions exist, as was the case in New Haven, there can be no doubt that many of those abroad, intentionally or not, represented a threat to the peace and quietude of the general public. Under the then prevailing circumstances, a threat of a breach of the public peace was tantamount to an actual breach. In such circumstances, preventive action is far more desirable than actions remedial.

The term "breach of the peace" can hardly be called vague in view of the numerous Connecticut court decisions defining the whole term as well as each word thereof. *State* v. *Van Allen,* supra; *Malley* v. *Lane,* supra; *State* v. *Cantwell,* 126 Conn. 1, 6; see *Cantwell* v. *Connecticut,* 310 U.S. 296, 309. At this late date, there can be no doubt as to what is meant by a breach of the peace in this state.

As to the prosecution under General Statutes § 53-175 (disorderly conduct), which provides that "[a]ny person who, by offensive or disorderly conduct, annoys or interferes with any person in any place" shall be punished, a quotation from *State* v. *Robinson,* 23 Conn. Sup. 430, 431, 1 Conn. Cir. Ct. 292 (and see the cases there cited), seems appropriate: "Disorderly conduct was not an offense at common law. . . . It is punishable as a separate and distinct offense by statute. The place of the commission of the alleged act is an element of the offense. . . . There are differences in the literal purport of the term 'in any place.' 'Under most statutes the conduct, to be disorderly, must take place in a "public place," and where the statute uses "any place" it will be construed to refer to "any public place." A public place is one which members of the public use or attend for reasons of business, entertainment, instruction or the like. . . .' "

A riot has thus been defined: "Any use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot." Cal. Pen. Code § 404; Black, Law Dictionary (4th Ed.), p. 1490.

It is apparent that the meaning and interpretations given the statutes in question leave little argument as to their vagueness or uncertainty.

It is the decision of this court that the motion to dismiss is denied.