**Perry GLOVER, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 4718.**

District of Columbia Court of Appeals.

Argued Sept. 23, 1968.

Decided Feb. 25, 1969.

---

Richard J. Hopkins, with whom Herbert O. Reid, Sr., Washington, D. C., was on the brief, for appellant.

Leo N. Gorman, Asst. Corp. Counsel, with whom Charles T. Duncan, Corp. Counsel, Hubert B. Pair, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellee.

Before MYERS, KELLY and KERN, Associate Judges.

KERN, Associate Judge:

This appeal challenges the validity of the curfew imposed by the Commissioner of the District of Columbia throughout Washington on the afternoon of April 5, 1968, at 5:30 p. m., which barred all persons from the streets of the District of Columbia except "law enforcement officers, firemen, physicians, nurses, and medical personnel, and employees of the D.C. Department of Sanitary Engineers".

At trial, it was stipulated that appellant had been on a street in Washington, D.C., at 8:45 p. m. and it is conceded that he did not fall within the category of exceptions excused from the reach of the curfew. Appellant moved to dismiss the information charging him with violation of the curfew on the grounds that (1) the Commissioner was without authority to impose such a curfew and (2) the penalty provision contained in the curfew proclamation for violations thereof was so vague as to void the proclamation itself. The trial court denied the motion, found appellant guilty and sentenced him to pay a fine of $12, or in default thereof, to serve five days in jail.

Appellant urges in addition to the contentions he made below that the curfew infringed his constitutionally protected rights of travel and of speech and assembly. We allowed the appeal because appellant's conviction raises serious issues. D.C. Code 1967, § 11–741(c).

D.C.Code 1967, § 1–226, provides:

The Commissioners [1] of the District of Columbia are hereby authorized and empowered to make and enforce all such reasonable and usual police regulations in addition to those already made under sections 1–224, 1–225, as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all

1. The term "Commissioners" in Section 1–226 refers to the District of Columbia's three-Commissioner form of government which was abolished by "Reorganization Plan No. 3, 1967", (Appendix to Title 1 of D.C.Code 1967, Supplement I, 1968) on August 11, 1967. The authority granted to the three Commissioners by Section 1–226 of the D.C.Code was transferred on November 3, 1967, by Section 402(4) of the "Reorganization Plan", supra, to a nine-member Council which in turn delegated, under Section 205(a) of the Re- organization Plan, the authority to make police regulations to the Commissioner of the District of Columbia—an office established by Section 301(a) of the Reorganization Plan. The delegation is contained in Resolution No. 68–7 of the D.C. Council, Section 5, February 20, 1968. The exercise of the power delegated is conditioned upon a prior written finding by the Commissioner that an emergency situation exists within the District of Columbia. Such a finding was made in the instant case.

persons and the protection of all property within the District of Columbia.

Appellant first argues that a curfew promulgated by the Commissioner would be valid only if Congress had expressly authorized such curfew since it substantially interfered with the federal government by limiting the free movement of its employees. It seems clear that the District of Columbia has a primary responsibility to maintain an orderly community for otherwise no effective government is possible. The threat to effective government may come quickly and without warning as when the city suddenly became rampant with rioting, looting, and burning on April 5th. One of the principal reasons why Congress delegated general authority to issue police regulations was to enable the Council and the Commissioner to cope with emergency situations, such as the one which developed here, to which Congress could not possibly respond with sufficient speed and flexibility and with the special knowledge of local conditions which should determine the action to be taken.

■ The general authority of the District government to make and enforce police regulations for the protection and welfare of its residents without prior specific enabling legislation by Congress has been repeatedly recognized. See District of Columbia v. John R. Thompson Co., 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953); Filippo v. Real Estate Commission of District of Columbia, D.C.App., 223 A.2d 268 (1966); Central Amusement Co. v. District of Columbia, D.C.Mun.App., 121 A.2d 865 (1956). *A fortiori*, it should be so recognized in the case of a sudden catastrophe threatening the very existence of a viable community. We hold that Section 1–226 was sufficient authority for the Commissioner's promulgation of the curfew without the need of express legislation conferring specific authority to restore order after the outbreak of serious disorders.

■ Appellant next contends that the curfew constituted neither a reasonable nor a usual police regulation. On April 5, 1968, the Commissioner of the District of Columbia determined that an emergency situation existed in the District of Columbia and that measures were necessary to protect both persons and property. He based his determination on the following factors:

1. The health, safety and well-being of persons within the District of Columbia is threatened or endangered by the existence of disorder and civil disturbance within the District of Columbia.

2. The secure possession and use of property, and the free exercise of rights by persons within the District of Columbia is threatened and endangered by said disorder and civil disturbance.

3. The orderly functioning of the Government of the District of Columbia is interfered with or disrupted or threatened with interference or disruption by said disorder and civil disturbance.

In *Filippo, supra* at 273 of 223 A.2d, we considered what constituted a reasonable regulation and concluded: " * * * [P]recedent suggests that a regulation is reasonable if its *subject* is one which is 'naturally productive of material discomfort to persons of ordinary susceptibilities, tastes, and habits' ".[2] (Emphasis supplied). At the time the curfew was imposed federal troops were entering the city to combat widespread disturbances which were producing "material discomfort", to say the least, to the citizens of Washington.

■ The Congress in Section 1–226 restricted the District of Columbia to the issuance of "usual" police regulations. In *Filippo, supra,* we considered the existence of open housing regulations and ordinances in other municipalities as evidence that such a regulation in the District of Colum-

---

2. *See* Heylman v. District of Columbia, 27 App.D.C. 563 (1906); Crane v. District of Columbia, 53 App.D.C. 159, 289 F. 557 (1923).

bia would be "usual" within the meaning of Section 1–226. Unhappily, the nation has witnessed in recent years numerous civil disorders and disturbances in American cities which have increasingly had to resort to curfews to deal with such disorders.[3] Since the curfew has become a usual device employed by municipalities to quell riots, we conclude that the curfew applied here was a usual police regulation within the scope of Section 1–226.

Appellant asserts that the curfew in this case abridged the freedom of travel which is guaranteed to him by the Fifth Amendment to the Constitution as well as his freedom of speech and of assembly by preventing him from congregating with others in public places. It is true that the curfew proclamation restricted severely the activities of the citizens of Washington during the period it was in effect and we must be certain that these restrictions were not more stringent than necessary to restore and assure peace and order in the community. NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Cox v. Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

As a part of our review, we would ordinarily consider the availability of other governmental responses which could end disorder yet place fewer restrictions on travel, free speech, and assembly. Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S. Ct. 1659, 12 L.Ed.2d 992 (1964). However, we are not aware of any substantiated body of knowledge with regard to how to deal with civil disorder once it has reached the emergency stage[4] For this reason, we cannot say of any suggested alternative that it would have quelled the rioting as quickly and to the same extent as the curfew here in question. Therefore, we confine our review to the question of whether the curfew proclaimed in this case was so extensive as to geographical area and so unreasonable as to the length of time for which it was invoked and as to the elements of the citizenry which it affected as to require us to hold that it was unconstitutional.[5]

■ The curfew was applied to the entire District of Columbia. In view of the dispersion of the disturbances throughout scattered areas of the District[6] and the lack of any discernible pattern to such outbreaks city officials could not predict with any certainty where new disturbances would next occur. We believe that the application of the curfew to the entire District was not unreasonable under all the circumstances.

The curfew was in force from 5:30 p. m. on April 5th to 6:30 a. m. on the following morning. On successive nights thereafter, the hours of curfew were progressively narrowed as disorder within the community subsided and the danger of further outbreaks lessened. We do not find this schedule to be unreasonable. The curfew

---

3. Report of the National Advisory Commission on Civil Disorders, March 1, 1968, 72 n. 80; "Judicial Control of the Riot Curfew", 77 Yale L.J. 1560, 1561 n. 6 (July, 1968).

4. *See* Report of the National Advisory Commission on Civil Disorders, *supra* n. 3, "Danger of Overreaction", 180, "The Control Effort", 71 et seq., "Police Tactics", 175–76, and "Laws Applicable Only in Emergency Situations", 290.

5. A reading of decisions in other jurisdictions determining the validity of curfew proclamations is not helpful. No two municipalities have had to contend with

quite the same threat to the community. *Compare* People v. Kearse, 56 Misc.2d 586, 289 N.Y.S.2d 346 (Syracuse City Court, 1968) and Thistlewood v. Trial Magistrate for Ocean City, 236 Md. 548, 204 A.2d 688 (1964) with City of Milwaukee v. Friend, G. 4490, Circuit Court Branch 11, Milwaukee County, Wisconsin, Memorandum Opinion of Judge Steffes, March 29, 1968; Ervin v. Wisconsin, Wis., 163 N.W.2d 207 (1968); and State v. Boles, 5 Conn.Cir. 22, 240 A.2d 920 (1967).

6. Report on Civil Disturbances in Washington, D. C., April 1968, map behind title page.

was effective in keeping persons off the streets and the most serious disorders had occurred at night.[7] Certainly, as of 8:45 on the night of April 5, 1968, when appellant was arrested on the street, the hours of the curfew were reasonable and it is that night to which his challenge must be directed. United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

The curfew was applicable to "[a]ll persons other than law enforcement officers, firemen, physicians, nurses, and medical personnel and employees of the D. C. Department of Sanitary Engineering". It commanded that they "remain off the streets and away from public places." The curfew was thus a "presence" type curfew during which *being* in public places is prohibited as contrasted with "loitering" or "vagrancy" curfews which ban loitering, congregating or remaining in proscribed places without good reason. It has been recognized that in certain very grave situations an absolute curfew is a reasonable measure to be applied in the community. In Zemel v. Rusk, 381 U.S. 1, at 15, 85 S. Ct. 1271, at 1280, 14 L.Ed.2d 179 (1965), the Supreme Court, speaking through the Chief Justice, said:

The right to travel *within* the United States is of course also constitutionally protected, cf. Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119. But that freedom does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area * * *.

The situation in Washington, D. C. at the time of the imposition of the curfew had deteriorated to the point where the city had requested and received from the President federal troops to cope with the widespread fires and looting then existing. Some action was necessary to keep people off the streets and away from public places in Washington so as not to hamper efforts to restore order or otherwise add to the existing confusion. We conclude that unlimited travel within the city would have materially and directly interfered with the safety and welfare of the citizens of Washington.[8]

■■ As a part of his constitutional arguments appellant asserts that the curfew as imposed made no allowance for lack of notice on the part of the general public and that such a defect invalidated his arrest. It would of course be improper to proclaim a regulation and then arrest a person for violating it without affording a reasonable period of time for notice. The curfew was proclaimed at 5:15 p. m. on April 5, 1968, to take effect 15 minutes later, at 5:30 p. m. We might well consider contrary to due process and therefore invalid a conviction of a person arrested at 5:30 p. m. or so soon thereafter that he did not know and did not have reasonable opportunity to know that a curfew was in effect. In the instant case, appellant's arrest occurred more than three hours later after the curfew had been announced and there is nothing in the record before us to

7. *Id.*, "Proclamations of Emergency". It should be noted that a disturbance limited in time and place had occurred on the night of April 4th, immediately after Dr. King's tragic murder, and was apparently brought under control. Although it was thought that peace and order had been restored, far more serious disorders occurred less than 24 hours later. Thus, the city authorities scarcely had any reliable indicators based upon past experiences to indicate when order had been truly restored.

8. The effect of the disorders on public safety and welfare is reflected in these statistics: 645 buildings and 283 housing units damaged or destroyed; seven persons dead, 83 persons admitted to the hospital and 1056 persons treated in hospital emergency facilities; and damages of more than 13 million dollars. *Id.*; "Damage Estimate", 1. The total money cost of the riot was estimated at 27 million dollars. Ten Blocks from the White House: Anatomy of the Washington Riots of 1968, Gilbert, p. 119.

suggest that he did not know and could not have known of the existence of the curfew.

■ Appellant contends that the curfew was void because it failed to state which of several possible penalty provisions would be the basis of punishment for violation thereof and left to the courts the task of fixing the penalty in each case. He contends that as a result the sentence imposed upon curfew violators would vary according to the particular judge who happened to be hearing a curfew violation case.

Council Resolution 68–17 authorized the Commissioner "to prescribe reasonable penalties of fine not to exceed three hundred dollars or imprisonment not to exceed ten days, pursuant to the provisions of D.C. Code, Section 1–224a". The Commissioner, in proclaiming the curfew, stated only that violations "will be punished as misdemeanors". There is, of course, no statutory provision fixing a penalty for "misdemeanors", as such. However, since the curfew proclamation was a police regulation, Article 30, Section 4 of the Police Regulations of the District of Columbia governs. It provides: "Any person violating any section or paragraph of these regulations wherein a penalty is not specifically provided shall on conviction be punished by a fine of not more than $300".[9] The trial court in the instant case fined appellant $12, well within the maximum amount which it could have imposed.[10]

■ Appellant contends that he was denied due process because of "the high prob-

ability" of different sentences being imposed by different courts. This is a probability which exists in all cases coming before the courts. So long as appellant was not punished in excess of the penalty provided for by the police regulations, the precise sentence to be imposed was within the discretion of the sentencing court.

Appellant cites three recent decisions by the United States Court of Appeals for the District of Columbia in the *Feeley, Jalbert* and *Smith*[11] cases to support his contention that the penalty for curfew violations was so vague as to require reversal of his conviction. These cases held that the defendants who had demonstrated on the Capitol grounds and within the Capitol were not advised as they should have been of the laws they were charged with violating. The court there gave considerable weight to the fact that the applicable statutes were numerous and overlapping and the theory of the prosecutions was ambiguous. No such uncertainty existed in the instant prosecution. Consequently, we hold that appellant's contention regarding ambiguity in the penalty provision of the proclamation is without merit.

The conviction of appellant is accordingly

Affirmed.

MYERS, Associate Judge, agrees with the result but is not in full accord with all the reasoning.

---

9. The D. C. Police Regulations have since been amended to provide that a violation of a curfew imposed by the Commissioner as a part of Emergency Regulations shall carry the penalty, upon conviction, of a fine not to exceed $300 or imprisonment not to exceed 10 days. *See* Order of the District of Columbia Commissioner No. 68–432, June 19, 1968.

10. The trial court imposed a five day jail term in default of the $12 fine but this alternative sentence of imprisonment is

not the primary penalty for the crime for which appellant was convicted. See D.C.Code 1967, § 16–706; Henderson v. United States, D.C.App., 189 A.2d 132 (1963).

11. Feeley v. District of Columbia, 128 U.S. App.D.C. 258, 387 F.2d 216 (1967); Smith v. District of Columbia, 128 U.S. App.D.C. 275, 387 F.2d 233 (1967); Jalbert v. District of Columbia, 128 U.S. App.D.C. 275, 387 F.2d 233 (1967).