611 A.2d 599

Vanessa BROWN, et al.

v.

Richard ASHTON, et al.

No. 1682 Sept. Term, 1991.

Court of Special Appeals of Maryland.

July 9, 1992.

Reconsideration Granted in Part Sept. 1, 1992,
Opinion Corrected Sept. 28, 1992.

Certiorari Granted Nov. 17, 1992.

Willie J. Mahone (Daniel Q. Mahone, on the brief), Frederick, for appellants.

Kevin A. Dunne, David R. Johanson, Venel D. Brown and Ober, Kaler, Grimes & Shriver, Baltimore, for amicus curiae, American Civil Liberties Union of Maryland.

Joseph F. Cunningham (Megan M. Heinze and Joseph F. Cunningham & Associates, on the brief), Washington, D.C., for appellees.

Argued before CATHELL, MOTZ and HARRELL, JJ.

MOTZ, Judge.

This appeal presents questions as to the constitutionality of a juvenile curfew ordinance and civil liability for acts done in enforcing the ordinance.

## FACTS AND PROCEEDINGS BELOW

On June 15, 1978, the Board of Aldermen of the City of Frederick enacted an ordinance aimed at restricting the nighttime activities of persons under 18, within the city limits. The curfew imposed by the Board provides that it is illegal for a "child," defined as "any person under the age of eighteen (18) years," to "remain in or upon any public place or any establishment between the hours of 11:59 p.m. Saturday and 6:00 a.m. Sunday; or between the hours of 11:00 p.m. and 6:00 a.m. of the following day on any other day of the week." Frederick City Code, §§ 15-9, 15-10 (1991). The ordinance exempts from the curfew children accompanied by a parent or guardian, children "upon an errand directed by" a parent or guardian, children "attending a cultural, scholastic, athletic, or recreational activity supervised by a bona fide organization," and children who are "engaged in gainful lawful employment during the curfew hours." § 15-11.

In addition, the ordinance makes it illegal for parents and owners and operators of any "establishment" to permit any child not exempted from the curfew to remain in public places during the restricted hours. §§ 15-12, 15-13. "Establishment" is defined as "any privately owned place of business carried on for a profit or any place of amusement or entertainment to which the public is invited." § 15-9(c). Finally, the ordinance prescribes the penalties for children, parents, and owners and operators of establishments, which

include, *inter alia*, taking a child into custody, immediate notification of the parents of such custody, and, after the second offense within 12 months, referral of the child to the department of juvenile services. § 15–14(a). Furthermore, any violation by a parent or owner or operator of establishments who has been advised of two prior violations by the same child within a 12–month period constitutes a misdemeanor punishable by a "fine not to exceed one hundréd dollars ($100.00)." § 15–14(b) and (c).[1]

In the years following the enactment of the curfew ordinance, it was rarely enforced. During the summer and fall of 1990, however, the Mayor of Frederick, Paul P. Gordon, received complaints regarding the noise level and harassment of passersby in a three-block area of North Market Street in downtown Frederick. Complaints centered on one North Market Street restaurant in particular, the Rainbow Hunan Restaurant ("the Rainbow"). A Chinese restaurant by day, the Rainbow was rented to a promotor who, on weekend nights, presented musical/dance events there that were attended primarily by African–American youth. According to Mayor Gordon, "Besides individual complaints received from citizens, on at least three occasions a group of residents came to City Hall to complain to the City about noise and loitering problems in the Market Street area, particularly involving the Rainbow Hunan." In addition, "great concern was shown by citizens as to why the Curfew Ordinance was not more aggressively enforced as a measure to control the noise and loitering problems." Moreover, "other restaurant owners in the Market Street area were also complaining about these problems and the Rainbow Hunan was mentioned specifically in several complaints," according to the Mayor.

On October 4, 1990, Mayor Gordon called a meeting of owners of restaurants in the North Market Street area, including the owners of the Rainbow. Three "measures of

---

1. The complete text of the curfew ordinance is set forth in the Appendix of this opinion.

controlling the noise and loitering problems" on North Market Street were discussed. These "measures" were: "the restaurant owners['] responsibility to control the noise level on the street; their responsibility to control the restaurants' entrance from becoming a fire hazard; and their responsibility to comply with the laws of Frederick City, including the Curfew Ordinance." On October 18, 1990, another meeting of restaurant owners was held to discuss strategies for managing the evening crowds on North Market Street. On Friday, October 19, 1990, Mayor Gordon announced at a candidates' forum that Frederick City police would soon begin enforcing the juvenile curfew ordinance. That announcement was reported in the lead article on the front page of the Frederick *News–Post* on the morning of October 20, 1990.

Enforcement of the curfew ordinance began at 11:59 p.m. on October 20. At least three checkpoints were planned,[2] one of which was the strip of restaurants on North Market Street that included the Rainbow. Police officers were instructed to "make a reasonable assessment of age" before detaining a young person and thus satisfy themselves that "a reasonable basis existed to conclude there was a curfew violation prior to taking any action." At about 12:30 a.m. on October 21, several police officers entered the Rainbow, "explained to the owners of the restaurant [their] purposes; and proceed[ed] to check the age of those patrons who appeared to be minors." Approximately 28 minors "were detained and led out to a bus waiting outside that had been designated to age verification purposes." According to the Frederick City Chief of Police, Richard J. Ashton, "this was done in an orderly and peaceful way."

Among those minors escorted out of the Rainbow was Tyeicka Bowens, then 16 years-old, who had been dancing inside. A police officer led Bowens to the bus outside the

---

2. It is unclear from the record whether the police in fact proceeded to the other two checkpoints, *i.e.*, an apartment complex and a location "out on 40 West."

Rainbow, where her picture was taken and she was re-strained with plastic handcuffs. An officer removed the handcuffs after Bowens complained that they were hurting her; she was then transported along with the other youths on the bus to the police station, "where parents or guardi-ans of the detained minors were called to pick them up." Neither Bowens nor any other minor was formally arrested or placed in cells.

Vanessa Brown was also picked up for violation of the curfew ordinance that night. Brown, who was then 19 years old and six months pregnant, had spent most of the evening at home with her friend Sherry Temple. At around 11:30 p.m., Brown and Temple "decided to ride around downtown"; when they arrived downtown, they decided to go to the Rainbow. Because all of the parking spaces on North Market Street were taken, Brown and Temple parked on another nearby street, and "once out of the car .... began walking to the club." As they arrived at the en-trance of Rainbow, Officer Steve Scalf of the Frederick police department approached them and requested identifi-cation. Scalf was among those police officers charged that night with the task of enforcing the curfew. His job during the earliest hours of October 21 "was to stand outside the Rainbow Hunan Restaurant and Lounge ... and look for curfew violators passing on the street." At Officer Scalf's request, Temple provided him with her identification doc-umenting that she was over 18 years old. Brown, however, had left her identification at home. Since Brown did not have identification with her, Officer Scalf instructed her to get on the waiting bus and remain there "until her age could be verified." Brown protested and attempted to get away from Officer Scalf's hold on her arm. Officer Scalf then led her to the bus with his hand at the back of her neck. Once in the bus, Brown's picture was taken and she was handcuffed. From inside the bus, she told Temple to go and obtain identification from her mother. Temple and Brown's mother returned with the identification; after con-firming that Brown was over the age restricted by the

curfew, the police released her from the bus. Approximately 15 to 20 minutes elapsed between the time Officer Scalf first approached her and Brown's release. After Brown got off the bus, she and her mother complained to Police Chief Ashton about Scalf's treatment of Brown, and then went to the police station where they repeated their complaint to another police officer. Brown did not, however, seek medical treatment for bruises or file a formal charge or complaint against Scalf.

On the evening in question, three other restaurants in the North Market Street area were checked for curfew violators; the record does not reflect whether any violators were found at these other restaurants. Nor is there any indication in the record as to the race of any of the other alleged violators picked up in and around the Rainbow. The curfew had not been enforced for at least a year prior to October 21, 1990; by the end of 1990, however, according to an affidavit filed by Chief Ashton, "besides the incident complained of in this action, the enforcement of the [curfew ordinance] resulted in approximately 34 arrests, 19 of which were black minors and 15 of which were white minors."

On November 23, 1990, Bowens (by her mother as her next friend) and Brown together filed a multi-count complaint in the Circuit Court for Frederick County against Ashton, Scalf, and the City of Frederick. The plaintiffs alleged the common law torts of negligence, assault and battery, false imprisonment, invasion of privacy, and intentional infliction of emotional distress. They also charged that they had been improperly arrested during the early morning hours of October 21, 1990, in contravention of their rights under 42 U.S.C. § 1983; the Maryland Constitution; and the First, Fourth, Fifth, Eighth, Thirteenth, and Fourteenth Amendments of the United States Constitution. Finally, they asserted that the juvenile curfew ordinance under which they were arrested violated the Due Process Clause, Equal Protection Clause, and First Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights.

The defendants filed a motion for summary judgment as to each cause of action. On October 3, 1991, the Circuit Court for Frederick County granted the defendants' motion in its entirety. First, the circuit court held that "there is a clear qualified immunity to the police officers, the City and the Chief on the common law counts." In support of that finding, the court found that Scalf acted "in the performance of his duty" and that there was "no showing of any malice" or of "any significant misconduct." Second, the court, after recognizing that intentional infliction of emotional distress was probably the most difficult tort for a plaintiff in Maryland "to prevail on," held the plaintiffs had failed to allege "the evil intent" or the "nasty action" necessary to state that claim. Third, the court granted summary judgment on the constitutional claims against the defendants because it found: (a) they had probable cause to detain Bowens and Brown, and (b) since there was "neither a suggestion of incompetence nor any knowing violation of the law," they were immune from liability. Finally, the court held that the curfew itself was constitutional, because "in its entirety" it was "not unreasonable" but, rather, "reasonably applied" and "not vague."

On appeal, all aspects of the order granting summary judgment are challenged. We address first the constitutionality of the ordinance and then consider the liability of those enforcing it. Because the lower court's decision involves issues of law, not fact, our review will focus on whether the decision below was legally correct. *Heat & Power Corp. v. Air Products & Chemicals, Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985).

## CONSTITUTIONALITY OF THE ORDINANCE

 Before considering the specific constitutional challenges to the Frederick ordinance, we briefly consider Maryland statutory and common law on the general subject of juvenile curfew ordinances. Maryland Annotated Code Article 23B, § 22(1) provides:

The council [of a municipal corporation, like Frederick] shall have the power to pass all such ordinances not contrary to the Constitution and laws of the State of Maryland or this charter as it may deem necessary for the good government of the town; for the protection of the town's property, rights and privileges; for the preservation of peace and good order; for securing persons and property from violence, danger, or destruction; and for the protection and promotion of the health, safety, comfort, convenience, welfare, and happiness of the residents of and visitors in the town.

Article 23B, §§ 22(2) and (16) provide:

(2) *Specific powers.*—The council shall have, in addition, the power to pass ordinances not contrary to the laws and Constitution of this State, for the specific purposes provided in the remaining subsections of this section.

(16) *Curfew.*—To prohibit the youth of the town from being in the streets, lanes, alleys, or public places at unreasonable hours of the night.

On the basis of these statutes, appellees maintain that, the "City of Frederick has *specific authorization* to enact curfew ordinances to limit the nighttime activities of minors from the Maryland Legislature" (emphasis added). This argument overlooks the fact that Article 23B, entitled Municipal Corporation Charter, was enacted by the General Assembly simply to serve as a model or guide for municipal corporations in formulating or amending their charters. It is not, and was never intended to be, a grant of power or "specific authorization" by the General Assembly to the municipal corporation. As Judge Eldridge carefully explained in *Campbell v. City of Annapolis*, 289 Md. 300, 310, 424 A.2d 738 (1981):

As made clear by the title and initial sections of the Act adopting Art. 23B, Chapter 258 of the Acts of 1955, § 1, pp. 375–376, the article is merely a model "for the use of any town desiring to adopt it." It is not a grant of power by the General Assembly, but the grant of power to the

municipal government is by the people of a municipality which chooses to adopt the model.

Thus, neither the City of Frederick, nor any other municipality, has "special authorization" from the General Assembly to enact a juvenile curfew ordinance. Moreover, even if Article 23B did provide this authority, which it does not, by the express terms of Article 23B that authority would have to be exercised in a way "not contrary to the Constitution of Maryland." Art. 23B, § 22(1).

Only once before has the constitutionality of a municipal corporation's juvenile curfew ordinance been considered by a Maryland appellate court. Accordingly, the Maryland common law on this subject is limited to *Thistlewood v. Trial Magistrate for Ocean City*, 236 Md. 548, 204 A.2d 688 (1964). There, the Court of Appeals upheld the constitutionality of an ordinance that prohibited persons under the age of 21 from remaining on the streets of Ocean City between the hours of 12:01 a.m. and 6:00 a.m. during the four-day Labor Day weekend of 1963. Even though *Thistlewood* predated the recent avalanche of reported opinions on the question and the elaborate rationales set forth in them, its constitutional analysis is both sensitive and sensible.

In *Thistlewood*, the Court of Appeals reasoned that, in order for a juvenile curfew ordinance to withstand constitutional scrutiny, three criteria must be met: (1) there had to be an evil; (2) the means selected to curb the evil had to bear a "real and substantial relationship" to the result sought; and (3) the means availed of could not unduly infringe upon the "fundamental rights" of those whose conduct was curbed. *Thistlewood*, 236 Md. at 556, 204 A.2d 688.[3] The Court examined the "evil" dealt with by the

---

3. Although the *Thistlewood* court never stated precisely what these "fundamental rights" were, other than "personal liberties," *id.* at 550, 204 A.2d 688, its discussion of precedent indicates it believed rights of freedom of movement, speech, association, and assembly were involved. *See id.* at 553, 557, 204 A.2d 688. The rights have been so characterized by subsequent courts. *See, e.g., Johnson v. City of Opelousas*, 658 F.2d 1065, 1072 (5th Cir.1981) (freedom of speech,

Ocean City ordinance, *i.e.*, control of disorder amounting almost to riots which had occurred on past Labor Day weekends, and concluded that the short duration curfew "bears a real and substantial relation to the objects sought to be attained." *Id.* The *Thistlewood* court then proceeded to the third inquiry, "the ultimate and critical question of whether the means, in view of the evil, unduly affronted the fundamental rights of the minors." *Id.* The Court concluded that the "fundamental rights of minors were not affronted or violated by the ordinance" because of "the demonstrated need for emergency use of the curfew in a resort town over Labor Day, the late and relatively short hours of the curfew and the fact that there were only four curfew days, the fact that its limited purpose was to prevent loitering or remaining in public areas, as opposed to merely using them for passage,[4] and, finally, the fact that it was directed only to minors who are peculiarly subject to regulation and control by the State." 236 Md. at 557, 204 A.2d 688. Thus, in *Thistlewood,* the Court of Appeals held that the juvenile curfew ordinance must not only withstand the

---

association and travel); *Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242 (M.D.Pa.1975), *aff'd without op.*, 535 F.2d 1245 (3rd Cir.), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976) (rights to freedom of movement); *People v. Chambers,* 66 Ill.2d 36, 4 Ill.Dec. 308, 360 N.E.2d 55, 57 (1976) (freedom of association and assembly); *S.W. v. State,* 431 So.2d 339, 341 (Fla.App.1983) (freedom of speech, association, peaceful assembly and religion); *W.J.W. v. State,* 356 So.2d 48, 50 (Fla.App.1978) (same). *Compare City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) (no constitutional right of "social association" that "includes chance encounters in dance halls," so ordinance restricting admission to certain dance halls to persons between ages of 14 and 18 upheld as having a rational basis).

**4.** The distinction between a prohibition against "loitering" in a public area (which was regarded as constitutional) and a prohibition against "being" in a public area (which was not) is the one portion of the *Thistlewood* analysis that does not withstand close scrutiny. Although a number of courts continue to rely on this distinction, *see, e.g., People in Interest of J.M.,* 768 P.2d 219, 224 (Colo.1989); *In re Nancy C.,* 28 Cal.App.3d 747, 105 Cal.Rptr. 113, 119 (1972), the better modern view is that the distinction is "mere semantics and untenable." *Bykofsky v. Borough of Middletown,* 401 F.Supp. at 1252.

"rational basis" test, but also, because it infringed upon "fundamental rights," must be narrowly drawn to further the asserted governmental purposes.

With the principles articulated in *Thistlewood* in mind, we turn to the constitutional challenges of the Frederick ordinance. As in most recent cases involving the constitutionality of juvenile curfews, this ordinance is challenged primarily on two grounds. First, the curfew is claimed to infringe upon minors' "fundamental rights," or to be "overbroad." [5] Second, it is asserted that it is unconstitutionally vague.

## Fundamental Rights

Although, as noted above, there is a plethora of recent reported opinions interpreting juvenile curfew ordinances, one scholar has remarked in epic understatement, "the judiciary has failed to reach a consensus on the validity of these enactments." Note, *Assessing the Constitutional Validity of Juvenile Curfew Statutes,* 52 Notre Dame Lawyer 858, 858 (1977) (and cases cited therein). *See also* Note, *Assessing the Scope of Minors' Fundamental Rights: Juvenile Curfews and the Constitution,* 97 Harv. L.Rev. 1163 (1984) (and cases cited therein). This is somewhat puzzling in light of the fact that in the twenty-five years since *Thistlewood* was decided, certain critical constitutional principles have become well established.

---

**5.** Many courts have, almost as a matter of rote, concluded that such statutes are "overbroad." *See, e.g., Johnson v. City of Opelousas,* 658 F.2d 1065, 1071 (5th Cir.1981); *In re Doe,* 54 Haw. 647, 513 P.2d 1385, 1388 (1973); *K.L.J. v. State,* 581 So.2d 920, 922 (Fla.App.1991); *Allen v. Bordentown City,* 216 N.J.Super. 557, 524 A.2d 478, 482 (1987). This approach has been criticized as inappropriate and unnecessary when "the challenged statute would have no greater impact upon the rights of nonparties than it would have upon the rights of parties." *Waters v. Barry,* 711 F.Supp. 1125, 1133 (D.D.C.1989). This well may be the situation here; because appellants have failed to "flesh out" their overbreadth argument, this is unclear. In any event, when, as here, those challenging a curfew ordinance claim that it was unconstitutionally applied to them, analysis of the ordinance would seem, most appropriately, to begin with a determination of that question, and then proceed, if necessary, to questions of overbreadth.

■ For example, it seems clear now, although it was not when *Thistlewood* was decided, that if an ordinance such as that imposed upon the children of Frederick were enacted against adults, it would be unconstitutional. That is, a general curfew which, unlike that in *Thistlewood,* is not compelled by an emergency, nor imposed for a short duration, nor in a very discrete geographical area, could not withstand constitutional scrutiny. This conclusion seems required by *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). There, in striking down on vagueness grounds a vagrancy statute, the Supreme Court expressly recognized the fundamental importance of a citizen's right to move about at will stating that such activities as "night walking," "loafing," or "strolling," while "not mentioned in the Constitution or the Bill of Rights," are "historically part of the amenities of life as we have known them." *Papachristou,* 405 U.S. at 164, 92 S.Ct. at 844. "The right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a free and ordered society." *Id.* The source of this right has been variously regarded as the Due Process Clause, *People in Interest of J.M.,* 768 P.2d 219, 221 (Colo.1989); the First Amendment, *People v. Chambers,* 66 Ill.2d 36, 4 Ill.Dec. 308, 310, 360 N.E.2d 55, 57 (1977); the Equal Protection Clause, *Allen v. Bordentown City,* 216 N.J.Super. 557, 524 A.2d 478, 485 (1987); and the Ninth Amendment, Note, *Juvenile Curfew Ordinances and the Constitution,* 76 Mich.L.Rev. 109, 118–25 (1977).

■ Whatever its source, this right is now widely regarded as "fundamental." Accordingly, because a statute infringing upon fundamental rights can survive judicial scrutiny only if narrowly drawn to serve a compelling state interest, *see, e.g., Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969); L. Tribe, *American Constitutional Law* §§ 16–6 to 7 (2d ed. 1988), and because there appears to be no compelling state interest justifying nonemergency curfews affecting adults, courts

**40**

have held that such statutes cannot survive constitutional challenge. *See Ruff v. Marshall*, 438 F.Supp. 303 (M.D.Ga. 1977) (holding such a statute unconstitutional); *City of Portland v. James*, 251 Or. 8, 444 P.2d 554 (1968) (same); *City of Seattle v. Drew*, 70 Wash.2d 405, 423 P.2d 522 (1967) (same); *Hayes v. Municipal Court of Oklahoma City*, 487 P.2d 974 (Okla.Crim.App.1971) (same); *Ames v. City of Hermosa Beach*, 16 Cal.App.3d 146, 93 Cal.Rptr. 786 (1971) (same). *See also Papachristou*, 405 U.S. at 164, 92 S.Ct. at 844; *Bykofsky*, 429 U.S. at 965, 97 S.Ct. at 395 (Marshall, J. dissenting from denial of certiorari) ("[a]bsent a genuine emergency ... a curfew aimed at all citizens could not survive constitutional scrutiny").

Moreover, on numerous occasions since *Thistlewood*, the Supreme Court has explicitly recognized that "a child, merely on account of [his or her] minority, is not beyond the protection of the Constitution." *Bellotti v. Baird*, 443 U.S. 622, 633, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797, *reh'g denied*, 444 U.S. 887, 100 S.Ct. 185, 62 L.Ed.2d 121 (1979). *Accord, Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14, 95 S.Ct. 2268, 2274–75, 45 L.Ed.2d 125 (1975) (confirming minors' access to nonobscene information); *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 514, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969) (free expression); *In re Gault*, 387 U.S. 1, 31–57, 87 S.Ct. 1428, 1445–59, 18 L.Ed.2d 527 (1967) (establishing minors' rights to counsel, notice, confrontation, and cross-examination in juvenile court proceedings).

In light of these now established principles, *i.e.*, (1) curfew statutes like that at issue here unconstitutionally burden fundamental constitutional rights of adults; and (2) minors do not lose constitutional rights because of their age, it would seem to follow as a matter of logic that the

Frederick ordinance and all similar juvenile curfew ordinances are unconstitutional. This "logic," however, ignores a critical factor, which was recognized by the *Thistlewood* court, *i.e.*, "the activities and conduct of those under twenty-one may be regulated and restricted to a far greater extent than those of adults." 236 Md. at 557, 204 A.2d 688.

█ This is so, not because constitutional rights become less fundamental when enjoyed by children, *Tinker v. Des Moines School Dist.*, 393 U.S. at 511, 89 S.Ct. at 739, but because the lack of maturity and judgment of children supplies the government with different and additional compelling interests in regulating their conduct. *Bellotti v. Baird*, 443 U.S. at 634, 99 S.Ct. at 3043. *See also*, 52 Notre Dame Lawyer at 868 ("the existence of a constitutional right is not affected by the application of that right to either a minor or an adult; the constitutional rights involved in curfew situations exist for all persons regardless of age"; however, "the scope of protection accorded these rights may well depend upon the age of the party allegedly restrained"). The Supreme Court has recognized three factors that will generally be found to justify differential treatment of the constitutional rights of minors: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird*, 443 U.S. at 634, 99 S.Ct. at 3043 (Powell, J. for a four-justice plurality).[6]

---

6. Although Justice Powell's decision was joined by only a plurality of the Court, those who wrote separately did not question the portion of his opinion setting forth these factors. Moreover, these factors have been subsequently adopted by numerous courts in analyzing legislation aimed at children, including virtually all the juvenile curfew cases. *See, e.g., Johnson v. City of Opelousas*, 658 F.2d at 1073; *Waters v. Barry*, 711 F.Supp. at 1136; *McCollester v. City of Keene*, 586 F.Supp 1381, 1385 (D.N.H.1984); *City of Panora v. Simmons*, 445 N.W.2d 363, 368 (Iowa 1989); *People in Interest of J.M.*, 768 P.2d 219, 223 (Colo. 1989); *City of Milwaukee v. K.F.*, 145 Wis.2d 24, 426 N.W.2d 329, 338 (1988).

Some courts have concluded that because the government has these different and additional interests in regulating the lives of children, the right of freedom of movement, although "fundamental" to adults, is not "fundamental" to children. *See, e.g., Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1253–58 (M.D.Pa.1975), *aff'd without op.,* 535 F.2d 1245 (3rd Cir.), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976); *People in Interest of J.M.,* 768 P.2d 219, 223 (Colo.1989) (*en banc*); *City of Panora v. Simmons,* 445 N.W.2d 363, 369 (Iowa 1989); *People v. Chambers,* 4 Ill.Dec. at 310, 360 N.E.2d at 57. The seminal case espousing the view is *Bykofsky v. Borough of Middletown, supra.* Although lengthy and well intentioned, its analysis is, quite simply, wrong, and has been so recognized by a number of authorities. *See, e.g., Waters v. Barry,* 711 F.Supp. 1125, 1136 (D.D.C.1989); *City of Panora v. Simmons,* 445 N.W.2d at 374 (dissenting opinion of four justices); Note, 97 Harv.L.Rev. at 1166, 1169, 1172 n. 44; Note, 52 Notre Dame Lawyer at 877–78.

In *Bykofsky,* upon which appellees heavily rely, the court expressly recognized that the curfew before it, although narrowly drawn, would nonetheless infringe upon the fundamental rights of adults. 401 F.Supp. at 1254–55. Yet it concluded that the ordinance affected no fundamental rights of minors and so applied the rational basis test to uphold it. *Id.* at 1265–66. The court reasoned that, because the interests served by the ordinance outweighed any infringement on the rights of minors, the ordinance affected no fundamental rights. *Id. See also People in Interest of J.M.,* 768 P.2d at 221–23 (relying on *Bykofsky* to similarly so hold); *City of Panora,* 445 N.W.2d at 368–69 (same). As the dissenters remarked in *City of Panora,* this analysis "was backward." 445 N.W.2d at 374. In determining the constitutionality of legislation a court must first determine the applicable level of scrutiny, *e.g.,* strict scrutiny or rational basis, and then determine if there are the necessary governmental interests to sustain the legislation in light of the applicable test. *See, e.g., Hornbeck v. Somerset Co.*

*Bd. of Educ.*, 295 Md. 597, 641, 458 A.2d 758 (1983); *Attorney General v. Waldron*, 289 Md. 683, 705–06, 426 A.2d 929 (1981); *Village of Deerfield v. Greenberg*, 193 Ill.App.3d 215, 140 Ill.Dec. 530, 534, 550 N.E.2d 12, 16 (1990); *Allen v. Bordentown City*, 524 A.2d at 485. In *Bykofsky*, the court determined the applicable level of scrutiny by weighing the asserted governmental interests, and then purported to apply the test arrived at by this unorthodox means to uphold the ordinance. For these reasons, we reject *Bykofsky* and the cases that have adopted its reasoning.

Instead, we examine the three *Bellotti* factors—the special vulnerability of children, their inability to make critical decisions in a mature manner, and the State's need to encourage parental control of children [7]—to determine if any one of them provides the compelling interest needed to justify restrictions, like those in the Frederick ordinance, on the fundamental rights of children. One, and only one, court has so held. In *City of Milwaukee v. K.F.*, 145 Wis.2d 24, 426 N.W.2d 329, 339 (1988), the Supreme Court of Wisconsin, with three justices dissenting, in summary manner concluded that "the interest of the municipality ... in protecting youths and curtailing juvenile crime is compelling and ... the ordinance ... is drawn as narrowly as practicable" and so meets the "strict scrutiny standard requiring a 'compelling state interest.'" *Id.* *See also*

---

7. Although appellees assert that these are the purposes served by the Frederick ordinance, we note there is no indication that these were the goals of the Board of Aldermen when it enacted the curfew ordinance in 1978. Nor were these goals considered sufficiently compelling by the City to warrant consistent enforcement of the curfew for over twelve years after its enactment. Moreover, the record indicates that the chief reason behind recent enforcement of the curfew was the "numerous complaints" from the citizens of Frederick City and restaurant owners on North Market Street regarding the increasing noise level and harassment of passersby in the area surrounding the Rainbow. The complaints of citizens regarding one area of town obviously do not justify the encroachment on the fundamental rights of the vast majority of Frederick City minors, who did *not* increase the noise level or harass passersby on North Market Street, to move as they please (or as their parents please) at night.

*Bykofsky*, 401 F.Supp. at 1258; *People in Interest of J.M.*, 768 P.2d at 223; *City of Panora*, 445 N.W.2d at 369; *City of Eastlake v. Ruggiero*, 7 Ohio App.2d 212, 36 O.O.2d 345, 220 N.E.2d 126, 129 (1966) (all finding these interests justify juvenile curfews under the rational basis standard). The Wisconsin analysis is so slight that it can hardly be regarded as persuasive.

Some of those courts that have used the *Bellotti* factors to hold that juvenile curfew ordinances have a rational basis, however, do provide more thoughtful discussions of these factors in the context of juvenile curfews. They have noted "the peculiar vulnerability of youngsters to drug usage and sexual contact," *City of Panora*, 445 N.W.2d at 369 (*citing City of Dallas v. Stanglin*, 490 U.S. 19, 27, 109 S.Ct. 1591, 1596, 104 L.Ed.2d 18 (1989)), and that "youths abroad at night are more vulnerable to crime and peer pressure than their adult counterparts." *People in Interest of J.M.*, 768 P.2d at 223. *See also People v. Chambers*, 4 Ill.Dec. at 310, 360 N.E.2d at 57 (juvenile curfew justified "upon the basic assumption that when a child is at home during the late night and early morning hours, it is protected from physical, as well as moral, dangers").

■ Children are vulnerable to crime and the emotional trauma it causes, perhaps more vulnerable than adults. *But see Waters v. Barry*, 711 F.Supp. at 1137 (crime "poses no *peculiar* damage to children ... violence is ubiquitous; it afflicts all of us") (emphasis in original). This vulnerability justifies our system of separate juvenile courts to protect children from emotional turmoil associated with crime. But the efforts of the juvenile courts to shield those involved in the judicial process "are a far cry from blanket restrictions on the liberties of children who face no such predicament." Note, 97 Harv.L.Rev. at 1175. The *Bellotti* court itself recognized that, while children can be specially treated to protect them from emotional trauma, with respect to "deprivations of liberty" their rights are "virtually coextensive" with that of adults. 443 U.S. at 634, 99 S.Ct. at 3043. Accordingly, we cannot conclude that children's special vul-

nerability justifies the Frederick ordinance. *See Waters v. Barry*, 711 F.Supp. at 1137.

Nor do the other two *Bellotti* factors justify it. With regard to the children's inability to make mature decisions, several courts have recognized that the decision to go outside during certain hours does not involve any critical decisions by minors. *Johnson v. City of Opelousas*, 658 F.2d at 1073; *Waters v. Barry*, 711 F.Supp. at 1137. Some courts, however, have concluded that "a child's immaturity may lead to a decision to commit delinquent acts, such as vandalism, drug or alcohol use, or crimes of violence," and this provides a rational basis for a juvenile curfew. *People in Interest of J.M.*, 768 P.2d at 232. *Accord, City of Panora*, 445 N.W.2d at 369. The problem with accepting this rationale as a compelling state interest justifying a juvenile curfew is that whether to commit a crime is not the decision specifically dealt with by a curfew. "Far from addressing a 'precisely delineated' set of activities that require children to make critical choices, a curfew prohibits all activities—even nondisruptive and nonharmful ones—in public during certain hours." Note, 97 Harv.L.Rev. at 1176–77. Properly drafted criminal statutes prohibiting the sale of liquor or pornography to minors and punishing vandalism and disturbance of peace, more specifically, and probably more effectively, deter and prevent criminal activity. *Compare, City of Dallas v. Stanglin.*

The final *Bellotti* factor is preservation of the parental role in child-rearing. A juvenile curfew ordinance that prohibits innocent and *parentally approved conduct, e.g.*, stargazing, or going for a walk, or attending a music/dance entertainment, as the appellants did here, does not further the parental role. Rather, it subverts the parental role by proclaiming that the government knows better than the parent what is necessary for the proper upbringing of the child. *See Johnson v. City of Opelousas*, 658 F.2d at 1074; *Waters v. Barry*, 711 F.Supp. at 1137; *Allen v. Bordentown City*, 524 A.2d at 487; *City of Seattle v. Pullman*, 82 Wash.2d 794, 514 P.2d 1059, 1064 (1973).

In sum, we conclude that the Frederick ordinance burdens the fundamental rights of minors and is not justified by any compelling governmental interest. This is, we note, the same conclusion that has been reached by the vast majority of courts that have, in considering juvenile curfew ordinances, recognized, as the Court of Appeals did in *Thistlewood,* that they infringe upon the "fundamental" rights of minors. *See Johnson v. City of Opelousas, supra; Waters v. Barry, supra; McCollester v. City of Keene,* 586 F.Supp. 1381 (D.N.H.1984); *City of Seattle v. Pullman, supra; In re Doe,* 54 Haw. 647, 513 P.2d 1385 (1973); *K.L.J. v. State,* 581 So.2d 920 (Fla.App.1991); *Allen v. Bordentown City, supra; City of Wadsworth v. Owens,* 42 Ohio Misc.2d 1, 536 N.E.2d 67 (Ohio Mun.1987); *S.W. v. State,* 431 So.2d 339 (Fla.App.1983); *W.J.W. v. State,* 356 So.2d 48 (Fla.App. 1978); *In re Mosier,* 59 Ohio Misc. 83, 13 O.O.3d 290, 394 N.E.2d 368 (Ct.Comm.Pleas.Ohio 1978); *Alves v. Justice Court of Chico Judicial Dist.,* 148 Cal.App.2d 419, 306 P.2d 601 (1957). *But see City of Milwaukee v. K.F., supra.*[8]

### *Vagueness*

■■■■■■■ An ordinance containing language so imprecise that it cannot be understood by persons of ordinary intelligence does not give fair notice of the acts that it forbids or requires and, therefore, denies due process. *Allen v. Bordentown City,* 524 A.2d at 481 (*citing Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). When persons of ordinary intelligence must necessarily guess as to the meaning of a law and, consequently, "differ as to its application," the law "violates the first essential of due process of law—to wit, providing fair warning and notice of what is prohibited or required so that one may act accordingly." *Bykofsky,* 401 F.Supp. at 1248 (*citing, inter alia, Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Lanzetta v. New*

---

**8.** In light of this conclusion, we need not reach the question of whether the ordinance is "overbroad." *See supra,* n. 5.

*Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939)); *City of Seattle v. Pullman,* 514 P.2d at 1062. Moreover, when the wording of a statute is vague, police officers lack an "ascertainable standard" by which to enforce it, *Allen v. Bordentown City,* 524 A.2d at 481, and the likelihood of "arbitrary enforcement" increases. *See Papachristou v. City of Jacksonville, supra,* 405 U.S. at 162, 92 S.Ct. at 843; *Naprstek v. City of Norwich,* 545 F.2d 815, 818 (2d Cir.1976).

▇ The four terms within the Frederick statute that are challenged for vagueness are (a) "bona fide organization"; (b) "cultural, scholastic, athletic, or recreational activity"; (c) "supervised"; and (d) "gainful lawful employment". None are defined in the statute. We are satisfied that, notwithstanding certain "possible ambiguities" that might be "hypothetically constructed" as to the application of the latter three terms, the conduct they proscribe is sufficiently self-explanatory. *See City of Milwaukee v. K.F.,* 426 N.W.2d at 334. *See also Eanes v. State,* 318 Md. 436, 459, 569 A.2d 604, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990) ("a law is not vague simply because it requires conformity to an imprecise normative standard"). The first term, however, is far less obvious in its intent. "Bona fide" is not explained in the ordinance; nor does the ordinance specify who is to say, and under what standards, an organization is to be regarded as "bona fide." In its amicus curiae brief, the American Civil Liberties Union asserts that the appellees had difficulty articulating in their depositions what a "bona fide organization" would be. In response, the appellees point out that Chief Ashton stated:

> ... They're in business for a profit. To sell alcohol, to sell food, and to have a live band there. They're not somebody who's going to take an interest in your child. Your minor child .. [I]f it's the YMCA or Boy Scouts, Girl Scouts, what have you, you know, their purpose in having a dance is to provide kids with recreation ... [N]ot to provide them with food and booze and the music.

And these are people there that make money and the way I see a bona fide organization is somebody that's putting on an activity for kids and they're going to care about the kids. It's going to be chaperoned and you can feel relatively safe sending your child there.

Thus, it appears that Chief Ashton's standard for determining if an organization will be considered "bona fide" for the purposes of the curfew is whether it is acting for profit, or whether the organization "cares" about the minors it seeks to entertain. Appellees also rely on the definition found in Black's Law Dictionary (5th Ed.1979) for the term "bona fide"—that is, "in or with good faith; honestly, openly, and sincerely, without deceit or fraud." These definitions are not necessarily consistent, given the fact that most for-profit organizations operate honestly, openly, and sincerely. Under the latter definition, the dance activities at the Rainbow would certainly qualify as being sponsored by a "bona fide" organization; under Chief Ashton's explanation, however, they would not. Moreover, we are averse, as other courts have been, to delegate to a single person, even the Chief of Police, the power to decide the meaning of the word "bona fide." *See, e.g., In re Mosier,* 59 Ohio Misc. 83, 13 O.O.3d 290, 394 N.E.2d 368, 377 (Ct.Comm.Pleas, Ohio 1978) (provision giving police chief authority to decide which organization may hold functions exempt from curfew "is an unconstitutional delegation of legislative authority and is unconstitutionally vague").

Indeed, a question raised by the ACLU is an important one: Would the attendance at a late evening concert at Hood College (located in Frederick City) by a minor, subject the minor, his or her parents, and the promoter of the concert to criminal penalties where the concert was promoted by an outside *for-profit* promoter who brought some contemporary cultural artist to the college? We are concerned that the answer to this question may depend on the makeup of the audience attending a for-profit event. As pointed out by the dissenters in *City of Panora, supra,* the type of law sought to be enforced by the City of Frederick

has an ugly history. Born of prejudice, curfew ordinances have risen in popularity during some sad times in this country. Before the civil war, curfew laws in the south designated times when slaves could be on the streets. *See Curfew Statute, Ordinance, or Proclamation,* 59 A.L.R.3rd 321, 326 (1974). During the late 1800s, immigrants were arriving in this country in great numbers. Though not treated as badly as slaves, the immigrants nevertheless faced prejudice. Curfew ordinances again became popular because of fears that immigrants could not control their children. *See* 97 Harv.L.Rev. at 1164 n. 9. In 1941 emergency curfews were imposed upon American citizens of Japanese ancestry. Ironically, some of our most decorated heroes in World War II were children of these Americans. *See* 59 A.L.R.3d at 349–51. *City of Panora,* 445 N.W.2d at 374 (dissenting opinion). Even the curfew had passed constitutional muster as serving a compelling interest, therefore, it could not survive the vagueness test because it fails to set forth a clear and nonarbitrary definition of "bona fide organization." History has proven that the arbitrariness of the enactment and of enforcement of curfews requires as much.

## LIABILITY FOR ENFORCEMENT
## OF THE ORDINANCE

The lower court held that the appellees were entitled to summary judgment with regard to all claims growing out of enforcement of the ordinance, *i.e.,* the common law claims (assault and battery, false imprisonment, invasion of privacy, intentional infliction of emotional distress, and negligence and gross negligence), the federal constitutional claims, and the claims of violation of the Maryland Declaration of Rights. Appellees assert that this result was proper for two reasons: (1) probable cause existed for the detention or arrest of Brown and Bowens; and (2) appellees are protected by governmental immunity.

Like the appellants in *Brewer v. Mele,* 267 Md. 437, 446, 298 A.2d 156 (1972), appellants' claims for money

damages for alleged abuse in enforcement of the ordinance "founders upon the shoals of probable cause." Probable cause to arrest without warrant exists when, at the time of the arrest, the facts and circumstances within the police officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that a crime has been or is being committed. *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991); *In re C,* 105 Cal.Rptr. at 118 ("honest and strong suspicion that the minor was in violation of the curfew ordinance" amounts to probable cause to arrest).

 Here, on the night in question, Officer Scalf "was instructed to make a reasonable assessment of age, and to satisfy [himself] that a reasonable basis existed to conclude there was a curfew violation prior to taking of any action." When he saw Brown on the street outside the Rainbow, she "appeared ... to be under the age of 18," and she was unable, moreover, to produce positive identification to the contrary. Officer Scalf was justified in briefly detaining or arresting[9] her to determine if she was, in fact, violating the curfew ordinance. Similarly, sixteen-year-old Bowens' youthful appearance constituted sufficient basis on which the police could detain her "in order to acquire additional information to confirm or refute" the impression (which proved accurate in her case) that she was violating the curfew ordinance. *People v. Smith,* 87 Mich.App. 730, 276 N.W.2d 481, 483 (1979); *People v. Coleman,* 50 Ill.App.3d 1053, 7 Ill.Dec. 581, 584–85, 364 N.E.2d 742, 745–46 (1977).

Thus, the question becomes, as it was in *Michigan v. De Fillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979), whether "it can be said that the officer lacked probable cause to believe that the conduct he observed and the words spoken constituted a violation of law simply

---

**9.** We need not here determine if Officer Scalf simply detained appellants or arrested them because there was, in all events, probable cause for their arrest. *Compare Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (police officer may temporarily detain a person for the purpose of investigating possible criminal activity even though the officer lacks probable cause to effect an arrest).

because he should have known the ordinance was invalid and would be judicially declared unconstitutional." The Supreme Court unequivocally held that the "answer is clearly negative." *Id.* The Court explained:

At that time [the time of arrest], of course, there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether the respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.

Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

443 U.S. at 37–38, 99 S.Ct. at 2632–33.

This rationale requires the similar conclusion here that, on October 21, 1990, there was probable cause for the detention or arrest of both Brown and Bowens for violation of the "presumptively valid ordinance." We have now held this ordinance unconstitutional but, as we have recounted in some detail within, numerous courts have come to a contrary conclusion when assessing very similar ordinances. Thus, it can hardly be said that the Frederick ordinance is a law "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id. See United States v. Landry,* 903 F.2d 334, 339 (5th Cir.1990) (even if unconstitutional juvenile curfew ordinance was basis for *Terry* stop, "evidence seized pursuant to search incident to an arrest based upon an officer's good faith reliance on a city ordinance not yet declared

unconstitutional, is valid"). *See also In re Hector*, 152 Cal.App.3d 1146, 200 Cal.Rptr. 110, 113 (1984). The fact that there was probable cause, of course, eliminates one of the critical elements of the tort of false imprisonment, *see Brewer v. Mele, supra*, 267 Md. at 440, 298 A.2d 156; *K-Mart v. Salmon*, 76 Md.App. 568, 583, 547 A.2d 1069 (1988), *cert. denied*, 314 Md. 496, 551 A.2d 867 (1989), and so provides a sound basis for the grant of summary judgment on that count. The presence of probable cause here, also has two other, more wide-ranging, consequences.

■ First, it makes grant of summary judgment on the State constitutional claims proper. This is so because those claims for violations of Articles 24 and 26 of the Maryland Declaration of Rights are, as appellants stated in their brief and reiterated at oral argument, "claims of improper search and seizure." Assuming without deciding that there has been a search and seizure here, since there was probable cause for appellants' arrest, any search and seizure was valid. *United States v. Robinson*, 414 U.S. 218, 229, 94 S.Ct. 467, 474, 38 L.Ed.2d 427 (1973) (an arresting officer may constitutionally search a person validly arrested; the fact of a lawful arrest, standing alone, authorized a search); *Colvin v. State*, 299 Md. 88, 98, 472 A.2d 953, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). Thus, there is no basis for a claim that the alleged search or seizure was unconstitutional, *Michigan v. De Fillippo*, 443 U.S. at 39–40, 99 S.Ct. at 2633–34, and so no basis for a violation of Article 24 or Article 26 of the Maryland Declaration of Rights. *See Gahan v. State*, 290 Md. 310, 321, 430 A.2d 49 (1981) (decisions of Supreme Court interpreting "kindred" federal constitutional provisions are entitled to "great respect" in interpreting Art. 26); *Hornbeck v. Somerset Co. Board of Educ.*, 295 Md. at 640, 458 A.2d 758 (decisions of Supreme Court interpreting equal protection clause are "persuasive authority" in cases involving "the

equal treatment provisions of Article 24").[10]

We do not here hold that the appellees acted in good faith and so enjoy some sort of immunity from state constitutional claims. The Court of Appeals has specifically held that "a public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity." *Clea v. City of Baltimore,* 312 Md. 662, 680, 541 A.2d 1303 (1988). *See also Ritchie v. Donnelly,* 324 Md. 344, 373, 597 A.2d 432 (1991). All that we hold here is that if a police officer has probable cause to arrest a person (like Bowens or Brown here), there is no basis upon which that person can assert that a search or seizure pursuant to that lawful arrest is unconstitutional. This holding is in no way inconsistent with *Clea.* The only questions before the Court there concerned the vicarious liability of Baltimore City and its Police Department for a police officer's conduct, and whether the officer was "entitled to public official immunity." *Clea,* 312 Md. at 664, 541 A.2d 1303. As Judge Eldridge carefully explained in the initial sentence of that opinion, those claims were premised "upon an *unlawful* search of the plaintiff's home." *Id.* (emphasis added). In contrast, here there was no unlawful search; rather, the search and seizure, if any, was lawful pursuant to a lawful arrest or detention.

In addition to eliminating the basis for appellants' false imprisonment and state constitutional claims, the presence of good cause for the arrests or detentions also provides the appellees with a basis for immunity as to all other claims. This is so because, when a police officer

---

**10.** The presence of probable cause would also seem to eliminate the federal constitutional claims. *See Claiborne v. Cahalen,* 636 F.Supp. 1271, 1277 (D.Md.1986) (*quoting Sheet v. Surdyka,* 492 F.2d 368, 372–73 (4th Cir.1974)) ("there is no cause of action for 'false arrest' under Section 1983 unless the arresting officer lacked probable cause"). Appellants, however, never articulate whether the sole basis for those claims, like the sole basis for the State constitutional claims, was an allegedly illegal search and seizure. Accordingly, we do not rest our holding with regard to the federal constitutional claims on this ground.

acts within the scope of his or her law enforcement function, the officer is a "public official," and, as such, is protected by a qualified immunity against civil liability for nonmalicious acts performed within the scope of employment. *Clea,* 312 Md. 662, 672–73, 541 A.2d 1303 (1988); *James v. Prince George's County,* 288 Md. 315, 323–24, 418 A.2d 1173 (1980). When a police officer has probable cause to detain someone, and does so without malice or evil intent, the officer is, therefore, immune from civil liability, even if he or she is incorrect in the decision to act. *See Civil Actions Against State Government,* § 6.24 (Wesley H. Winborne, Ed.) (1982, 1992 Supp.) (and cases cited therein).

Here, the plaintiffs ground each of their common law tort claims on allegations that they were "forcibly" handled and taken onto a bus, where they were searched, photographed, and handcuffed. They make no claim, however, that they were treated in a manner which, in the context of a lawful detainer, would not be considered within the scope of a police officer's employment and without malice. In the absence of probable cause to detain or arrest, a suit for assault and battery against a police officer might be permitted to go forward, *see Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 349–50, 278 A.2d 71 (1971); that is not the situation here. Nor can the claims of false imprisonment or invasion of privacy, given the probable cause that existed, overcome the appellees' qualified immunity. *Simons v. Montgomery County Police Officers,* 762 F.2d 30, 32–33 (4th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986). In addition, the appellees' qualified immunity also prohibits Brown and Bowens from proceeding with their assertions of "negligence and gross negligence." *Jones v. Maryland–Nat'l Capital,* 82 Md. App. 314, 333, 571 A.2d 859, *cert. denied,* 320 Md. 351, 578 A.2d 191 (1990). *See also Boyer v. State,* 323 Md. 558, 577, 594 A.2d 121 (1991).[11]

---

**11.** As for the assertion of intentional infliction of emotional distress, the trial court correctly found that nothing alleged by the appellants

■ Finally, with respect to the claims arising under federal law and the United States Constitution, the presence of probable cause also provides the appellees with qualified immunity from civil liability. Indeed, even if there was not probable cause, appellees would be entitled to summary judgment on these claims. This is so because, as the Supreme Court explained in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), public officials are shielded from liability under 42 U.S.C. § 1983 for any alleged violations of federal constitutional or statutory law "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See also Claiborne v. Cahalen, supra,* 636 F.Supp. at 1277. A reasonable person in Officer Scalf's position would not have known, absent a judicial determination that the presumptively valid ordinance was unconstitutional, that in detaining Bowens or Brown for possible violations of the curfew ordinance, he was violating their constitutional rights.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH DIRECTIVES SET FORTH WITHIN. COSTS TO BE PAID ONE HALF BY APPELLANTS AND ONE HALF BY APPELLEES.

APPENDIX

FREDERICK CITY CODE

Sec. 15–9. Definitions applicable to sections 15–10 through 15–14.

Wherever used in sections 15–10 through 15–14, inclusive:

---

arises to the "extreme and outrageous conduct" necessary to allege that tort. *See Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby,* 326 Md. 663, 607 A.2d 8 (1992); *Young v. Hartford Acc. and Indem. Co.,* 303 Md. 182, 196–97, 492 A.2d 1270 (1985); *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986).

(a) *Child* means any person under the age of eighteen (18) years.

(b) *Child in need of supervision* means a child who requires guidance, treatment, or rehabilitation because he has committed an offense applicable only to children.

(c) *Establishment* means any privately owned place of business carried on for a profit or any place of amusement or entertainment to which the public is invited.

(d) *Operator* means any individual, firm, association, partnership, or corporation operating, managing, or conducting any establishment; and wherever used in any clause prescribing a penalty, the "operator" as applied to associations or partnerships shall include the members or partners thereof and as applied to corporations shall include the officers thereof.

(e) *Parent* means any parent, adoptive parent, or any person who is twenty-one (21) years or older and who has the permanent or temporary care or custody or responsibility for the supervision of a child.

(f) *Public place* means any public street, highway, road, alley, park, playground, public building, or vacant lot.

(g) *Remain* means to loiter, as that term is defined in section 15–27(b) of this chapter, idle, wander, lounge, sleep, stroll, play in or upon. (Ord. No. G–78–15, § 1, 6–15–78)

Sec. 15–10. Unlawful Conduct of minors.

No child shall remain in or upon any public place or any establishment between the hours of 11:59 p.m. Friday and 6:00 a.m. Saturday; or between the hours of 11:59 p.m. Saturday and 6:00 a.m. Sunday; or between the hours of 11:00 p.m. and 6:00 a.m. of the following day on any other day of the week. (Ord. No. G–78–15, § 1, 6–15–78)

Sec. 15–11. Exceptions to section 15–10

The provisions of section 15–10 shall not apply to any child accompanied by a parent, or to a child upon an

errand directed by such minor's parent, or to a child attending a cultural, scholastic, athletic, or recreational activity supervised by a bona fide organization, or to any child who is engaged in gainful lawful employment during the curfew hours. (Ord. No. G–78–15, § 1, 6–15–78)

Sec. 15–12. Unlawful conduct of parents

No parent shall knowingly permit any child not exempted under section 15–11 to remain in or upon any public place or any establishment between the hours of 11:59 p.m. Friday and 6:00 a.m. Saturday; or between the hours of 11:59 p.m. Saturday and 6:00 a.m. Sunday; or between the hours of 11:00 p.m. and 6:00 a.m. of the following day, on any other day of the week. (Ord. No. G–78–15, § 1, 6–15–78)

Sec. 15–13. Unlawful conduct of owners and operators of establishments.

No operator of an establishment or his agents or employees shall knowingly permit any child to remain upon the premises of said establishment between the hours of 11:59 p.m. Friday and 6:00 a.m. Saturday; or between the hours of 11:59 p.m. Saturday and 6:00 a.m. Sunday; or between the hours of 11:00 p.m. and 6:00 a.m. of the following day on any other day of the week. (Ord. No. G–78–15, § 1, 6–15–78)

Sec. 15–14. Enforcement and penalty.

(a) Any city police officer who finds a child violating any provision of section 15–10 shall take such child into custody as a child in need of supervision, shall notify immediately, or shall cause to be notified immediately his parent of such custody, and shall refer said child to the local office of the state department of juvenile services the second time he is taken into custody during the preceding twelve-month period.

(b) Any violation of any provision of section 15–12 by any parent who has been advised by a city police officer within the preceding twelve (12) months of two (2) prior violations of section 15–10 by his child shall constitute a

58

misdemeanor, which shall be punishable by a fine not to exceed one hundred dollars ($100.00).

(c) Any violation of any provision of section 15–13 by any operator of an establishment or by an agent or employee of any operator who has been advised by a city police officer within the preceding twelve (12) months of two (2) prior violations of section 15–10 by the same child shall constitute a misdemeanor which shall be punishable by a fine not to exceed one hundred dollars ($100.00). (Ord. No. G–78–15, § 1, 6–15–78)